IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★  JUL 30 2013  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------------- X
                                       :
CHRISTOPHER TIRADO,                    :      03-CV-5604(ARR)(LB)
                                       :
                     Plaintiff,        :
                                       :
                                       :
     -v-                               :      CIVIL ACTION
                                       :
GREG DEBOERS, SHAUN WINTER,            :      DECLARATION OF SERVICE
DIEGO RIVERA, HENRY LEMONS,            :      VIA PRISONER MAILBOX
                                       :      RULE
                     Defendants.       :
-------------------------------------- X
```

I, CHRISTOPHER TIRADO, New Jersey State prisoner number(SN) #530914, New Jersey State Bureau of Identification(SBI) #360195B, declare the following facts are true to the best of my knowledge being aware of the penalties of fines and/or additional imprisonment for false swearing as if the statements contained herein were sworn to under oath pursuant to 28 U.S.C. §1746.

1. On the date of this Declaration, I served, via the prisoner mailbox rule, by placing in the hands of prison officials for mailing, with First Class U.S. postage prepaid, through the prison's CO-30A Postage Remit system three copies of an Amended Complaint and two copies this Declaration Of Service placed them in an envelope and addressed them to:

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK, BROOKLYN, NY  11201

2. Also on the date of this Declaration Of Service, I served in the same manner as in ¶1, two copies of the Amended Complaint and two copies this Declaration Of Service and addressed them to:

ALLISON MOE, ESQ.
CITY OF NEW YORK LAW DEPARTMENT
100 CHURCH STREET, NEW YORK, NY  10007

I declare under penalty of perjury that the foregoing is true and correct.
Executed on:

7.24.13                    _____
                           CHRISTOPHER TIRADO, PRO SE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------------ X
                                     :
CHRISTOPHER TIRADO,                  :    03-CV-5604(ARR)(LB)
                                     :
              Plaintiff,             :
                                     :
                                     :
    -v-                              :    CIVIL ACTION
                                     :
GREG DEBOERS, SHAUN WINTER,          :    Civil Rights Complaint,
DIEGO RIVERA, HENRY LEMONS,          :    42 U.S.C. §1983,
                                     :    as amended, pursuant to
                                     :    24APR13 Order of
              Defendants.            :    Allyne R. Ross, U.S.D.J.
                                     :
----------------------------------X
```

This is a civil rights action pursuant to 42 U.S.C. §1983 filed by Christopher Tirado, a New Jersey Prisoner, stating violations of his Constitutional and Federal Statutory rights, seeking declaratory and injunctive relief, and money damages.

The plaintiff, pursuant to 28 U.S.C. §1746 declares:

### JURISDICTION

1.  This Court has jurisdiction pursuant to 42 U.S.C. §1983.

### PARTIES

2.  The pro se, incarcerated plaintiff is Christopher Tirado, a New Jersey State Prisoner, prisoner number 530914, N.J. State Bureau of Identification number 360195B, incarcerated at New Jersey State prison, located at Second and Cass streets, Trenton, N.J., mailing address PO BOX 861, Trenton, N.J.  08625.

3.  Defendant Greg Deboers was a New York State official employed by and/or acting as an agent of the King's County District Attorney's Office, located at 350 Jay Street, Brooklyn New York, on October 29, 2001.

- 1 -

4.   Defendant Greg Deboers is sued in his official capacity for declaratory and injunctive relief.

5.   Defendant Greg Deboers is sued in his individual capacity for monetary, compensatory, punitive and other damages.

6.   Defendant Shaun Winter was a New York State official employed by and/or acting as an agent of the King's County District Attorney's Office, located at 350 Jay Street, Brooklyn New York, on October 29, 2001.

7.   Defendant Shaun Winter is sued in his official capacity for declaratory and injunctive relief.

8.   Defendant Shaun Winter is sued in his individual capacity for monetary, compensatory, punitive and other damages.

9.   Defendant Diego Rivera was a New York State official employed by and/or acting as an agent of the King's County District Attorney's Office located at 350 Jay Street Brooklyn, New York, on October 29, 2001.

10.   Defendant Diego Rivera is sued in his official capacity for declaratory and injunctive relief.

11.   Defendant Diego Rivera is sued in his individual capacity for monetary, compensatory, punitive and other damages.

12.   Defendant Henry Lemons was a New York State official employed by and/or acting as an agent of the King's County District Attorney's Office located at 350 Jay Street Brooklyn New York, on October 29, 2001.

13.   Defendant Henry Lemons is sued in his official capacity for declaratory and injunctive relief.

14.   Defendant Henry Lemons is sued in his individual

- 2 -

capacity for monetary, compensatory, punitive and other damages.

15. At all times relevant to this Complaint, all the above defendants acted under color of New York State law.

## FACTS

16. On or about 2:00 a.m., on October 29, 2001, I, Christopher Tirado, the plaintiff in this matter, was incarcerated at the Cliffside Park, N.J., police station after being arrested by a Cliffside Park N.J., police officer for possession of CDS and a knife while in Cliffside Park, N.J.

17. I am a pro se incarcerated litigant and have no formal training in criminal or civil law, have no formal education in the law of civil rights actions, civil procedure, and have not previously filed any Civil rights suits in Federal or State Courts. As a pro se incarcerated litigant I have limited access to law libraries at most once a week in New Jersey State prisons, and that access is necessarily limited without prior notice to me due to circumstances beyond my control due to the ever changing security needs of prisons.

18. I did not commit any crimes in the State of New York during the month of October 2001.

19. I did not steal any vehicle in the State of New York during October 2001.

20. I did not set any vehicle on fire in the State of New York during the month of October 2001.

21. I did not dispose of any .380 shell casing in New York during the month of October 2001.

22. I did not dispose of any .380 shell casing in any

- 3 -

abandoned vehicle in Brooklyn, New York during October of 2001.

23.  I did not leave any .380 shell casing in the vehicle that was set on fire in Brooklyn New York on October 5, 2001.

24.  I did not commit any carjacking, robbery or similar offense in the State of New York during October of 2001.

25.  While at the Cliffside Park, N.J., police station on October 29, 2001, before 9:00a.m., I was told I was to be released, about 7 hours after I was arrested by New Jersey police for possession of CDS and knife in Cliffside Park, N.J.

I

26.  On or about 9:00 a.m. on October 29, 2001, defendants Deboers and Winter arrived in person at the Cliffside Park, N.J. police station.

27.  Deboers came to the cell I was incarcerated in at the Cliffside Park police department and identified himself.

28.  Deboers was dressed in plain clothes and had his New York police badge on a chain around his neck.

29.  Deboers was carrying a gun that was plainly visible and was held in a holster on his hip.

30.  Deboers fabricated a story and told me that he had helped to secure my release from the Cliffside Park police station.

31.  Deboers advised that I had to go with them since I could not be released until I came with them to the Brooklyn District Attorney's office to take a polygraph test.

32.  I did not feel like I had any choice to refuse since Deboers said the polygraph was part of being released from the

- 4 -

Cliffside Park police station.

33.   A short while later, I was handcuffed by Deboers before I left the Cliffside police station.

34.   A person identifying himself as "Sean" [now known as defendant Sean Winter] accompanied Deboers and myself in the vehicle.

35.   Winter was dressed in plain clothes and had his New York police badge on a chain around his neck.

36.   Winter was carrying a gun that was plainly visible and was held in a holster on his hip.

37.   I was placed alone in the back seat of the vehicle which  had automatic door locks and power windows that were operated from the drivers seat.

38.   As the vehicle drove out of the police station parking lot, I asked Deboers if he could stop at my house which was only a couple blocks away so I could pick up my ulcer medication as I was having stomach pains, and possibly take a shower.

39.   Deboers advised "no we could not stop, you have to come with me to Brookyln because everything is all set up and waiting."

40.   I asked a second time, pleading with Deboers to stop at my house just to pick up my medication as I was having gut wrenching pains from not having my medication for so long.

41.   Deboers denied my second request for medication by stating "no," loudly.

42.   During the drive to New York, Both Deboers and Winter were questioning me about a murder that occurred in New Jersey

- 5 -

of my friend Isai Rosenblit but asked no questions directly nor indirectly related to a Lincoln Navigator fire in Brooklyn on October 5, 2001 (or the .380 casing, house key, soda cases, alcohol bottle, garbage, and other items found inside the Navigator), or about a robbery of a BMW that occurred in Brooklyn on October 16, 2001, or my whereabouts and activities before, during, or after the time and place of those incidents.

43.  I answered the questions as best I could since I did not know much about the questions and facts they asked about.

44.  I did not feel free to leave the presence of Deboers and Winter at any time while I was under the restrictions, control, and refusals to let me go to my house for medication despite my complaints about pain.

45.  I did not feel free to leave the presence of Deboers and Winter at any time while I was under the restrictions, control, and implied threats of coercion and/or force by the displays of badges and guns by Deboers and Winter.

46.  I did not feel free to leave the presence of Deboers and Winter at any time while I was under the restrictions, control, and fabricated story of Deboers and Winter helping to get me released from the Cliffside Park, N.J. police station.

47.  I did not feel free to leave the vehicle going to New York at any time while I was under the restrictions, control, and refusals of Deboers and Winter to let me go to my house for medication while I was in pain.

48.  I did not feel free to leave the vehicle going to New York at any time while I was under the restrictions, control,

- 6 -

and implied threats of coercion and/or force by the displays of badges and guns by Deboers and Winter.

49.  I did not feel free to leave the vehicle going to New York at any time while I was under the restrictions, control, and fabricated story of Deboers and Winter helping to get me released from the Cliffside Park, N.J. police station.

50.  I was carried away across state lines to New York from the Cliffside Park police station without ever exiting the vehicle or being allowed to open the vehicle windows.

51.  While being moved through Manhattan, I asked Deboers if they could stop at my girlfriend's job, which was on the way to Brooklyn, so I could pick up medicine she carried with her.

52.  At the time I asked Deboers to visit my girlfriend's job to get medicine form her, I was in alot of pain, sick, vomiting, and convulsing.

53.  Deboers told me no a third time, and that we could not stop because everything was all set up in Brooklyn, it would not take that long, and when it was over he would get me a cab to my girlfriends job and then I could take my medicine.

54.  I did not feel free to leave the presence of Deboers and Winter after crossing State lines into New York since I was never allowed out of the vehicle by Deboers and Winter during the transportation across state lines.

55.  I did not feel free to leave the presence of Deboers and Winter after crossing state lines into new York at any time while I was under the restrictions, control, and implied threats

- 7 -

of coercion and/or force by the displays of badges and guns by Deboers and Winter.

56.  I did not feel free to leave the presence of Deboers and Winter after crossing state lines into New York at any time while I was under the restrictions, control, and fabricated story of Deboers and Winter helping to get me released from the Cliffside Park, N.J. police station.

57.  I did not feel free to leave the vehicle after crossing state lines into New York since I was never allowed out of the vehicle nor to roll the windows down by Deboers and Winter after transportation across state lines.

58.  I did not feel free to leave the vehicle  after crossing state lines into New York at any time while I was under the restrictions, control, and refusals of Deboers and Winter to let me go to my girlfriend's job for medication despite my complaints to Deboers about serious pain.

59.  I did not feel free to leave the vehicle after crossing state lines into New York at any time while I was under the restrictions, control, and implied threats of coercion and/or force by the displays of badges and guns by Deboers and Winter.

60.  I did not feel free to leave the vehicle after crossing state lines into New York at any time while I was under the restrictions, control, and fabricated story of Deboers and Winter helping to get me released and bailed.

61.  At no time while in New York while the vehicle was transporting me was I allowed out of the vehicle until we arrived in a locked garage at the Kings County D.A.'s office.

- 8 -

## II

62. When the vehicle arrived outside the Kings County D.A.'s office, the vehicle first went into a garage next to the District Attorney's office.

63  Then the vehicle went into another garage where a door was opened by Deboers and then shut and locked behind the vehicle after the vehicle went into it.

64. While in the King County D.A.'s office as I was visibly aware that I was in a locked garage inside the King's County District Attorney's office and did not feel free to leave.

65.  When the door shut behind the vehicle I was audibly aware that I was in a locked garage in the King's County D.A.'s office and I did not feel free to leave.

66.  I felt confused, anxious, and confined as I did not understand the need for all these security precautions for a polygraph test that could have been done in New Jersey by New Jersey police.

67.  I was then held and confined at the Kings County District Attorney's office by Deboers, Winter, and Rivera.

68.  Once the vehicle came to a stop I was taken in handcuffs up to a windowless holding cell on either the 18th or 16th floor of the D.A.'s office and locked inside alone.

69.  While locked in this holding cell for many hours, without being told anything about why it was taking so long I did not feel free to leave the cell or the D.A.'s office.

70.  Periodically Deboers would come to check on me.

71.  Each time Deboers would stop by, I asked if we could

- 9 -

put this off until the next day, that I was not feeling well, and that I needed my medicine.

72. Deboers refused my requests each time I asked.

73. During this time I was very sick, in constant pain from spitting yellowish bile as there was nothing left in my stomach and so I did not feel free to leave the cell or the D.A.'s office.

74. I was locked in the holding cell for several hours.

### III

75. Eventually, Deboers came to the cell and advised that everything was ready and so in a little while I would be able to take my medicine.

76. I was then taken to a different floor to another windowless room, and another detective who identified himself as Rivera, who is also defendant Rivera in this action.

77. Rivera had his New York police badge around his neck.

78. Rivera then explained the polygraph procedure.

79. I again asked if this test could be put off till the next day because I was in pain and retching into a pail that Rivera brought me so I could throw up into.

80. Rivera said "No, you cant go until you answer the polygraph questions" and that Rivera was "just following orders from Lemons who was in charge of this".

81. Since Rivera denied my requests to postpone the test and to speak to Lemons, I did not feel free to leave the polygraph test room of the D.A.'s office.

82. As Rivera started the polygraph test and asking

- 10 -

questions, I was shaking, lightheaded, dizzy, and spitting into the pail that Rivera brought into the room.

83.   After a while Rivera started to wrap me with a bunch of wires and kept yelling at me to stop shaking and spitting.

84.   I again asked if we could put the test off until the next day as my ulcer was causing severe pain.

85.   Rivera asked no questions directly nor indirectly related to a Lincoln Navigator fire in Brooklyn on October 5, 2001 (or the .380 casing, house key, soda cases, alcohol bottle, garbage, and other items found inside the Navigator), or about a robbery of a BMW that occurred in Brooklyn on October 16, 2001, or my whereabouts and activities before, during, or after the time and place of those incidents.

86.   I answered the questions as best I could since I did not know much about the questions and facts they asked about.

87.   Rivera never answered my subsequent requests to postpone the test but eventually told me that it was almost over and that I would be able to get my medicine and a drink in a few minutes.

88.   Although Rivera eventually took the wires off me and left me locked in the room, I was still scared, nervous, and anxious because of the way the defendants had treated me.

89.   I still have nightmares about being taken away by strangers with New York police badges, locked and trapped in a windowless room, vomiting, spitting bile, and never being able to get out.

90.   About 30 minutes later, Deboers then came into the

- 11 -

room.

91.  I asked if I passed the test and Deboers said he did
not know yet "since Lemons was calling the shots on this," to
which I immediately replied that I did not care but that I just
wanted to go and get my medicine.

92.  Deboers told me to wait just a few more minutes and
he would talk to Lemons about it.

93.  Deboers left with me locked inside the room.

### IV

94.  About 15 minutes later, at around 5:15 p.m., Deboers
came to the room again.

95.  At this point I was angry since I had not been free
to leave for so long and had been restrained and controlled
against my will so long that I asked Deboers if I passed his
stupid test, that I wanted to leave and go get a drink and go
meet my girlfriend to get my medicine.

96.  Deboers then told me that Lemons said I failed the
polygraph test, and so I was not going anywhere.

97.  I stated that I wanted to leave and got up to do so,
and that is when New Jersey officials Gregory Kohles and Steve
Kearny entered the room and told me they were arresting me for
killing my friend Isai Rosenblit.

98.  I was never formally or informally charged with
violating any New York law by Deboers, Winter, Rivera or Lemons.

99.  I was never provided or offered a hearing to determine
if there was probable cause for New York officials to believe
that I had committed a crime in New York.

- 12 -

V

100.  My plans that morning in New Jersey were to see a lawyer about the CDS and knife charges from Cliffside Park, N.J., defrost my freezer, and clean my bathroom.

101.  I was interrupted and prevented from pursuing these plans by the acts and omissions of Deboers, Winter, Rivera, and/or Lemons.

VI

102.  Defendants Deboers and Winter seized me by restricting and taking control of my freedom of bodily integrity when they fabricated a story about helping me to get released and get bail, when they put handcuffs on me, when they refused to let me go to my house to shower or get medicine, when they refused to let me go to my girlfriend's job in New York to get medicine despite knowing that I was in pain, and/or when they moved me against my will and without my consent from the Cliffside Park police station at or about 9:00 a.m. on October 29, 2001 to the Kings County New York District Attorneys office.

103.  Defendants Deboers and Winter seized me by restricting and taking control of my personal freedom of movement when they fabricated a story about helping me to get released and get bail, when they put handcuffs on me, when they refused to let me go to my house to shower or get medicine, when they refused to let me go to my girlfriend's job in New York to get medicine despite knowing that I was in pain, and/or when they moved me against my will and without my consent from the Cliffside Park police station at or about 9:00 a.m. on October 29, 2001 to

- 13 -

the Kings County New York District Attorneys office.

104.    Defendants Deboers and Winter seized me by restricting and taking control of my right to continue on my schedule, itinerary and my plans for that day when they fabricated a story about helping me to get released and get bail, when they put handcuffs on me, when they refused to let me go to my house to shower or get medicine, when they refused to let me go to my girlfriend's job in New York to get medicine despite knowing that I was in pain, and/or when they moved me against my will and without my consent from the Cliffside Park police station at or about 9:00 a.m. on October 29, 2001 to the Kings County New York District Attorney's office.

105.    Defendants Deboers and Winter seized me by restricting and taking control of my liberty to go about my business when they fabricated a story about helping me to get released and get bail, when they put handcuffs on me, when they refused to let me go to my house to shower or get medicine, when they refused to let me go to my girlfriend's job in New York to get medicine despite knowing that I was in pain, and/or when they moved me against my will and without my consent from the Cliffside Park police station at or about 9:00 a.m. on October 29, 2001 to the Kings County New York District Attorneys office.

106.    Defendants Deboers and Winter seized me by restricting and taking control of my freedom to take medicines when they fabricated a story about helping me to get released and get bail, when they put handcuffs on me, when they refused to let me go to my house to shower or get medicine, when they refused

- 14 -

to let me go to my girlfriend's job in New York to get medicine despite knowing that I was in pain, and/or when they moved me against my will and without my consent from the Cliffside Park police station at or about 9:00 a.m. on October 29, 2001 to the Kings County New York District Attorneys office.

107. Defendants Deboers and Winter seized me by restricting and taking control of my freedom to communicate with other free persons when they fabricated a story about helping me to get released and get bail, when they put handcuffs on me, when they refused to let me go to my house to shower or get medicine, when they refused to let me go to my girlfriend's job in New York to get medicine despite knowing that I was in pain, and/or when they moved me against my will and without my consent from the Cliffside Park police station at or about 9:00 a.m. on October 29, 2001 to the Kings County New York District Attorneys office.

## VII

108. A .380 shell casing was allegedly found by NJ officials inside a Lincoln Navigator set on fire in Brooklyn, New York on October 5, 2001, while the NJ officials were searching the Navigator for a second time while the Navigator was in New Jersey.

109. Defendants Deboers, Winter, and Rivera never asked me any questions about the fire in the Lincoln Navigator on October 5, 2001, or my whereabouts or my presence at, near, or before, during, or after the scene and time of that crime in New York.

- 15 -

110.   Defendants Deboers, Winter, and Rivera never asked me any questions about the robbery of the BMW on October 16, 2001, or my whereabouts or my presence at, near, or before, during or after during the scene and time of that crime in New York.

111.   A search of the burned out Lincoln Navigator by New Jersey officials was conducted from October 10-12, 2001, that discovered the door lock to the Navigator had been broken out.

112.   On October 17, 2001, Fire Marshall Mazzarella noted in a report that the Navigator had been removed to the Bergen County P.D. at the direction of NJ official Detective Sgt. Suarez, of the Bergen County prosecutor's office.

113.   On October 17, 2001, Senior Fire Marshall Rignola approved Fire Marshall Mazzarella's recommendation that the case of the fire that burned out the Lincoln Navigator, previously identified as third degree arson, BKY 31861 - 2001, complaint number 8639, was to be closed without any suspect or arrest being named in the report.

114.   Defendants Deboers, Winter, Rivera and Lemons never asked me any questions about the robbery of a BMW from Jack Harari on October 16, 2001.

115.   Jack Harari testified he could not see the face of the man who stole his BMW and could not provide a description.

116.   At a trial of the plaintiff for offenses occurring in New Jersey, Harari could not identify the plaintiff as the person who stole the BMW on October 16 from him, despite the long and well lighted opportunity to see plaintiff Tirado at

- 16 -

the defense table during an attempted in-court identification.

117.   Defendants Deboers and Winter never stated that they knew of, nor said that there ever existed knowledge of facts and circumstance constituting probable cause that I committed any crime in New York State at the time when they arrived at the Cliffside Park police station.

118.   Defendants Deboers and Winter had no knowledge of facts and circumstances constituting probable cause that I committed any crime in New York State at the time when they arrived at the Cliffside Park police station.

### VIII

119.   No report or analysis was made of the .380 casing found in the Navigator that was made by an expert based on their knowledge skill experience, training or education that would materially contribute to ascertainment of the true gun through which the casing was fired.

120.   No report or analysis was made of the .380 casing found in the Navigator that had a sufficient scientific basis as to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the true gun through which the casing was fired.

121.   No report or analysis was made of the .380 casing found in the Navigator that used facts or data that are reasonably relied upon by experts in the field of shell casing analysis.

122.   No report or analysis was made of the .380 casing found in the Navigator that was based on a generally accepted

- 17 -

methodology in the relevant scientific community that would
materially add to the ascertainment of the true gun through
which the casing was fired.

123. On information and belief, Defendants Deboers, Winter,
Rivera, and Lemons had no knowledge that the shell casing in
the Navigator was found by a report or analysis to match a gun
later found in plaintiff's possession during an arrest by New
Jersey officials in New Jersey.

IX

124. No report or analysis was made of the .380 casing
found in the Navigator that scientifically established the age
of the shell casing based on how long ago it had been made by
having been fired through a gun.

125. No report or analysis was made of the .380 casing
found in the Navigator that scientifically established the age
of the casing based on how long ago it had been made by having
been fired through a gun that were made by an expert based on
their knowledge, skill, experience, training or education that
would materially contribute to ascertainment of the true date
when the casing was made by having been fired through a gun.

126. No report or analysis was made of the .380 casing
that scientifically established the age of the casing based
on how long ago it had been made by having been fired through
a gun that was based on facts or data that are reasonably relied
upon by experts in the field of shell casing age analysis.

127. No report or analysis was made of the .380 casing
that scientifically established the age of the casing based

- 18 -

on how long ago it had been made by having been fired through a gun that was based on a generally accepted methodology in the relevant scientific community that would materially add to the ascertainment of the true date the casing was made.

128.   Deboers, Winter, Rivera and Lemons had no knowledge that the shell casing in the Navigator was found by a report or analysis to be of a certain age or time period from when it was made by being fired through a gun.

129.   Neither Deboers, Winter, Rivera nor Lemons ever showed me or said that they had, or said that there ever existed an arrest warrant relevant to any crime committed in New York State that named Christopher Tirado at the time when Deboers and Winter arrived at the Cliffside Park police station.

130.   Neither Deboers, Winters, Rivera, nor Lemons had any arrest warrant relevant to any crime committed in New York State and that named the plaintiff at the time when Deboers and Winters arrived at the Cliffside Park police station.

X

131.   Neither Deboers nor Winter nor Rivera nor Lemons ever advised me that they had a verbal, oral, or otherwise non-documentary order, authorization, or other permission from the Governor of New York State advising that I had committed or that there was probable cause that I had committed any crime in New York State at the time when Deboers and Winter arrived at the Cliffside Park police station.

132.   Neither Deboers nor Winter nor Rivera nor Lemons ever advised me that they had a verbal, oral, or otherwise

- 19 -

non-documentary order, authorization, or other permission from the Governor of New York State advising that I was a fugitive from New York State, or that I had committed or that there was probable cause to believe that I had committed any crime in New York State at any time after Deboers and Winter arrived at the Cliffside Park police station.

133.   On information and belief, neither Deboers nor Winter nor Rivera nor Lemons had any verbal, oral or otherwise non-documentary order, authorization or other permission from the Governor of New York State advising that I was a fugitive form New York State, that I had committed or that there was probable cause to believe that I had committed any crime in New York State at the time when Deboers and Winter arrived at the Cliffside Park police station.

134.   On information and belief, neither Deboers nor Winter nor Rivera nor Lemons had any verbal, oral or otherwise non-documentary order, authorization or other permission from the Governor of New York State advising that I was a fugitive from New York State, that I had committed or that there was probable cause to believe that I had committed any crime in New York State, at any time after Deboers and Winter arrived at the Cliffside Park police station.

135.   Neither Deboers nor Winter nor Rivera nor Lemons ever showed me any extradition warrant or other written documentary order, authorization, or other permission from the Governor of New York State stating that I was a fugitive from New York State, that I had committed or that there was probable

- 20 -

New York State, that I had committed or that there was probable cause that I had committed any crime in New York State, or otherwise substantially charging me with a crime at the time when Deboers and Winter arrived at the Cliffside Park police station.

136.   Neither Deboers nor Winter nor Rivera nor Lemons ever showed me any extradition warrant or other written documentary order, authorization, or other permission from the Governor of New York State stating that I was a fugitive from New York State, that I had committed or that there was probable cause that I had committed any crime in New York State, or otherwise substantially charging me with a crime after Deboers and Winter arrived at the Cliffside Park police station.

137.   On information and belief, Deboers, Winter, Rivera, and Lemons had no warrant or other written, electronic or other documentary order, authorization, or other permission from the Governor of New York State stating that I had committed or that there was probable cause that I had committed any crime in New York State, or otherwise substantially charging me with a crime at the time when Deboers and Winter arrived at the Cliffside Park police station.

138.   On information and belief, Deboers, Winter, Rivera and Lemons had no warrant or other written, electronic or other documentary order, authorization, or other permission from the Governor of New York State stating that I had committed or that there was probable cause that I had committed any crime in New York State, or otherwise substantially charging me with a crime

- 21 -

after Deboers and Winter arrived at the Cliffside Park police station.

XI

139.  The plaintiff's false arrest by New York State officials made in New Jersey at the Cliffside Park N.J. police department terminated favorably with respect to all New York State offenses.

140.  The plaintiff's false arrest by New York State officials made in the defendants locked vehicle while leaving the Cliffside Park N.J. police department terminated favorably with respect to all New York State offenses.

141.  The plaintiff's unauthorized ex tradition to New York State from New Jersey terminated favorably with respect to all New York State offenses.

142.  The plaintiff's false imprisonment by New York State officials in New York State and at the Kings County D.A.'s office terminated favorably with respect to all New York State offenses.

143.  The false arrest, illegal extradition, and false imprisonment by defendants on October 29, 2001 all terminated favorably since no probable cause ex isted to arrest the plaintiff for any offense in New York, plaintiff was never charged, provided a Gerstein hearing, arraigned, indicted, convicted nor sentenced in New York State as a result of the New York officials' false arrest of plaintiff at the Cliffside Park, N.J. police department, false arrest in the defendants vehicle leaving the Cliffside Park police station, illegal extradition to New York State without substantially charging the commission

- 22 -

of an offense based on probable cause, and false imprisonment in the King's County District Attorney's office.

## CLAIMS

### FIRST CAUSE OF ACTION

144. The plaintiff restates and incorporates all previous paragraphs as if stated herein.

145. Defendants intentionally falsely arrested the plaintiff at the Cliffside Park New Jersey police station without probable cause to believe that the plaintiff had committed an offense in New York State with the intent to punish him by depriving him of his liberty.

146. The plaintiff was conscious of the confinement by defendants.

147. The plaintiff did not consent to the confinement by defendants and did not feel free to leave their presence.

148. The confinement by defendants was not otherwise justified or privileged.

149. Defendants Deboers, Winter, and/or Lemons, by their acts, omissions, practices, habits, and informal policies, falsely arrested plaintiff at the Cliffside Park, New Jersey police station violating the plaintiff's Fourth and Fourteenth Amendment rights.

### SECOND CAUSE OF ACTION

150. The plaintiff restates and incorporates all previous paragraphs as if stated herein.

151. Defendants intentionally falsely arrested the plaintiff in their vehicle without probable cause to believe

- 23 -

that the plaintiff had committed an offense in New York State
with the intent to punish him by depriving him of his liberty.

152.   The plaintiff was painfully conscious of the
confinement by defendants.

153.   The plaintiff did not consent to the confinement
by defendants and did not feel free to leave the vehicle and
was constantly in pain while being denied permission from
multiple requests to three defendants to stop, get medicine,
or postpone the matter until the next day.

154.   The confinement by defendants was not otherwise
justified or privileged.

155.   Defendants Deboers, Winter, and/or Lemons, by their
acts, omissions, practices, habits, and informal policies,
falsely arrested plaintiff while in their vehicle violating
the plaintiff's Fourth and Fourteenth Amendment rights.

### THIRD CAUSE OF ACTION

156.   The plaintiff restates and incorporates all previous
paragraphs as if stated herein.

157.   Defendants intentionally and falsely imprisoned the
plaintiff in the King's County District Attorney's office in
Brooklyn, New York,  without probable cause to believe that
the plaintiff had committed an offense in New York State with
the intent to punish him by depriving him of his liberty.

158.   The plaintiff was painfully conscious of the
confinement by defendants.

159.   The plaintiff did not consent to the confinement
by defendants and did not feel free to leave the Kings County

- 24 -

District Attorney's office and was constantly in pain and was denied permission from multiple requests to three defendants to stop, get medicine, or postpone the matter until the next day.

160.  The confinement by defendants was not otherwise justified or privileged.

161.  Defendants Deboers, Winter, Rivera, and/or Lemons, by their acts, omissions, practices, habits and/or informal policies falsely imprisoned plaintiff at the King's County Brooklyn District Attorneys office violating the plaintiff's Fourth and Fourteenth Amendment rights.

<u>FOURTH CAUSE OF ACTION</u>

162.  The plaintiff restates and incorporates all previous paragraphs as if stated herein.

163.  Defendants Deboers, Winter, and/or Lemons, intentionally failed to substantially charge the plaintiff as a fugitive from New York with probable cause to believe plaintiff committed an offense in New York and to charge the plaintiff fled to New Jersey to avoid prosecution for an offense in New York State while not having probable cause to believe that plaintiff committed an offense in New York State and while intending to punish him by depriving him of his liberty.

164.  Defendants Deboers and Winter, refused to stop or divert their involuntary transportation of plaintiff, or provide him medical relief, despite the plaintiff's continuing complaints of constantly experiencing gut wrenching stomach pains.

165.  Defendants Deboers, Winter, Rivera, and/or Lemons,

- 25 -

by their acts, omissions, practices, habits and/or informal policies illegally extradited plaintiff from the Cliffside Park New Jersey police station to shanghai him into the King's County Brooklyn District Attorneys office, violating the plaintiff's substantive or procedural Due Process rights, violating New York officials' duties under Article IV, section 2, clause 2, violating the Uniform Extradition Act, 18 U.S.C. §3182, violating 18 U.S.C. App.Sec.2, and violating the Fourteenth Amendment.

## FIFTH CAUSE OF ACTION

166. The plaintiff restates and incorporates all previous paragraphs as if stated herein.

167. Defendants knew of plaintiff's medical condition immediately after he was placed in custody in the vehicle at 9:00 a.m. on October 29, 2001, but ignored the plaintiff's repeated complaints of pain about a serious medical condition until after 5:30 p.m.

168. Defendants Deboers, Winter, Rivera and/or Lemons, ignored the risks to plaintiff's health by denying him medical care, denying his multiple requests for his stomach medicine, and continuing to violate plaintiff's Constitutional rights by continuing to falsely arrest, kidnap, illegally extradite, and falsely imprison plaintiff.

169. Defendants Deboers, Winter, Rivera, and/or Lemons, were deliberately indifferent to plaintiff's stomach condition for over eight hours from 9:00 am on October 29, 2001 in New Jersey, crossing state lines, and up to 5:30 p.m. that day in New York when New Jersey officials arrested plaintiff pursuant

- 26 -

to a New Jersey arrest warrant.

170. Defendants Deboers, Winter, Rivera, and/or Lemons violated plaintiff's rights against cruel and unusual punishment in the Fourteenth Amendment as a pre-trial detainee when they were deliberately indifferent to his complaints of pain due to a serious medical condition.

### SIXTH CAUSE OF ACTION

171. The plaintiff restates and incorporates all previous paragraphs as if stated herein.

172. Defendants Deboers, Winter, Rivera, and Lemons failed to provide the plaintiff with a Gerstein hearing to determine whether there was probable cause to arrest plaintiff for committing any crime in New York State to hide their intent to punish him by depriving him of his liberty.

173. Even after the arrest by New Jersey officials, and despite the plaintiff's presence in New York State for almost three months after October 29, 2001 for extradition proceedings to New Jersey, no Gerstein hearing was ever provided for the plaintiff.

174. Defendants Deboers, Winter, Rivera, and/or Lemons denied plaintiff's right to a prompt judicial determination of probable cause after plaintiff's arrest, violating the plaintiff's Fourth and Fourteenth Amendment rights.

### SEVENTH CAUSE OF ACTION

175. The plaintiff restates and incorporates all previous paragraphs as if stated herein.

176. Defendants Deboers, Winters, and/or Lemons, by their

- 27 -

acts and omissions unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and/or carried away and held Christopher Tirado from the Cliffside Park N.J. police station across state lines to the Kings County, Brooklyn N.Y., District Attorney's office for reasons unknown, contrary to 18 U.S.C. §1201(a)(5).

177.  Defendants Deboers, Winter, Rivera, and/or Lemons, by their acts, omissions, practices, habits and/or informal policies kidnapped the plaintiff from the Cliffside Park New Jersey police station to shanghai him into the King's County Brooklyn District Attorneys office violating the plaintiff's substantive Due Process rights and violating the Fourteenth Amendment.

## RELIEF

**WHEREFORE,** the plaintiff requests that this Honorable Court grant the following relief:

A.  Issue a declaratory judgment declaring that defendants violated the United States Constitution when they:

1)  Falsely arrested the plaintiff without probable cause, justification, or privilege in violation of the Fourth and Fourteenth Amendment;

2)  Falsely imprisoned the plaintiff without probable cause, justification, or privilege in violation of the Fourth and Fourteenth Amendment;

3)  Illegally extradited the plaintiff from New Jersey

- 28 -

to New York without probable cause, justification, or privilege violating New York officials' duties under Article IV, section 2, clause 2, violating the Uniform Extradition Act, 18 U.S.C. §3182, and violating 18 U.S.C. App.Sec.2, violating the plaintiff's substantive Due Process rights under the Fourteenth Amendment;

4) Acted with deliberate indifference to the plaintiff's complaints of pain for over eight hours while he was a pre-trial detainee in violation of the Fourteenth Amendment;

5) Failed to provide a Gerstein hearing to determine probable cause for any crime committed in New York state in violation of the Fourth Amendment and Fourteenth Amendment;

6) Kidnapped the plaintiff contrary to 18 U.S.C. §1201(a)(5) and thereby violated the plaintiff's substantive Due Process rights under the Fourteenth Amendment.


B.  Issue an injunction ordering that defendants and their agents:

1) Refrain from falsely arresting the plaintiff without probable cause;

2) Refrain from falsely imprisoning the plaintiff at the Kings County District Attorney's office;

3) Refrain from extraditing the plaintiff without substantially charging the plaintiff with an offense based on probable cause;

4) Refrain from subjecting the plaintiff while a pre-trial detainee to deliberate indifference to his serious medical

needs;

     5)  Refrain from denying the plaintiff a hearing to determine probable cause for any offense in New York;

     6)  Refrain from kidnapping the plaintiff.


    C.  Grant compensatory damages in the following amounts:

     1)  500,000 against defendant Greg Deboers;

     2)  500,000 against defendant Sean Winter;

     3)  200,000 against defendant Diego Rivera;

     4)  200,000 against defendant Henry Lemons.


    D.  Grant treble punitive damages against each of the above defendants for their intentionally vile, wanton, and wicked violations of the United States Constitution.


    E. Grant such other relief as it may appear the Plaintiff is entitled.

I certify under penalty of perjury and pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Executed on:

July 22 13

CHRISTOPHER TIRADO, PRO SE
PN# 530914, SBI#360195B
PO BOX 861, NJ STATE PRISON
TRENTON, NJ 08625

- 30 -